## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN COSTELLO,<br><br>        Plaintiff,<br><br>v.<br><br>BARRY BREEMAN and PAMELA BREEMAN,<br><br>        Defendants. | Civil Case No.<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Brian Costello ("Mr. Costello" or "Plaintiff"), by and through his undersigned counsel, brings this Complaint against Defendants Barry Breeman ("Mr. Breeman") and Pamela Breeman ("Mrs. Breeman" and collectively with Mr. Breeman, "Defendants"), and in support thereof, alleges as follows:

## INTRODUCTION

1.      This case is about Barry Breeman admitting that he ran a years-long Ponzi scheme that defrauded investors, like Mr. Costello, out of millions of dollars.

2.      Mr. Costello is a self-made businessman and military veteran who founded—and as its CEO and President for over 30 years has run—a successful company focused on manufacturing and purveying high-quality safety signs, pipe markers, valve tags, and parking and traffic signs.  Mr. Costello developed a close, personal friendship with Mr. Breeman and came to know him as a sophisticated real estate investor who co-founded a leading real estate investment

1

firm with a focus on commercial, hospitality, and residential real estate in Latin America and the Caribbean.

3.    Over the course of 15 years, Mr. Breeman offered Mr. Costello many attractive, and potentially lucrative, opportunities to invest in transactions related to his work in Latin American and Caribbean real estate.  Mr. Costello accepted these opportunities to invest with his close friend and entered into agreements with Mr. Breeman reflecting the profits and corporate interests that he was due to receive.

4.    It was not until September 2024 that Mr. Costello discovered it was all a lie.

5.    Mr. Breeman attempted suicide in September 2024, and in his suicide note, explicitly admitted that he had been running a "Ponzi scheme" and that he "stole a lot of money from many investors for non-existent real estate deals," including from Mr. Costello.  He left instructions for his wife (Mrs. Breeman) designed to "fend off angry creditors" and prevent those creditors from collecting on Mrs. Breeman's valuables, and Mrs. Breeman admitted that Mr. Breeman's fraud likely surpassed $50 million.  Mr. Breeman survived his suicide attempt.

6.    Mr. Costello brings this action to recover what he is owed from Mr. Breeman's fraudulent and unlawful actions in furtherance of the Ponzi scheme.

## **PARTIES**

7.    Plaintiff Brian Costello is a former resident of Tuxedo Park, New York, and has been a resident of Fort Myers, Florida, since 2019.

8.    Upon information and belief, Defendant Barry Breeman is a resident of Tuxedo Park, New York.

9.    Upon information and belief, Defendant Pamela Breeman is a resident of Tuxedo Park, New York.

## JURISDICTION AND VENUE

10.     This is a civil action for: (1) violation of the Securities and Exchange Act of 1934 (the "Exchange Act") Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; (4) fraud; (5) violation of New York Debtor & Creditor Law § 273; (6) conversion; and (7) unjust enrichment.

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Mr. Costello's first cause of action arises under the Exchange Act.

12.     This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 because they are so closely related to Mr. Costello's Exchange Act claim as to form part of the same case or controversy.

13.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity exists between the parties.  Plaintiff is a citizen of Florida, and Defendants are citizens of New York.

14.     This Court has personal jurisdiction over Defendants by virtue of their Tuxedo Park, New York residence and domicile, and their commission of tortious and unlawful acts in New York.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all defendants are residents of New York and because a substantial part of the events or omissions giving rise to this action, including the tortious and unlawful acts alleged herein, occurred in this district.

## FACTUAL BACKGROUND

**A.    The Parties' Relationship**

16.    Mr. Costello is a self-made businessman and military veteran who founded—and as its CEO and President for over 30 years has run—a successful company focused on manufacturing and purveying high-quality safety signs, pipe markers, valve tags, and parking and traffic signs.

17.    Mr. Costello met Mr. Breeman while Mr. Breeman lived in Warwick, NY.  Mr. Costello and Mr. Breeman originally became acquainted because their children were enrolled in the same school.

18.    Over the years, Mr. Costello and Mr. Breeman became close friends.  The two men shared mutual friends, experiences in the Tuxedo Park community, and their respective families developed close relationships.

19.    In 2009, Mr. Breeman was a partner in Caribbean Property Group ("CPG"), which is a United States-based real estate investment firm with a dedicated focus in Latin America and the Caribbean.

20.    Mr. Breeman co-founded CPG in 1998 and for years worked for CPG purportedly to produce financial returns for its investors through investments in commercial, hospitality, and residential real estate in Latin America and the Caribbean.  In fact, CPG advertises itself as the "leading real estate equity investor in Latin America and the Caribbean."

21.    Mr. Breeman's work with CPG caused him to become well-known as a sophisticated real estate investor in Latin America and the Caribbean, with high-profile financial and political connections in the United States, Puerto Rico, and elsewhere.

**B.    Mr. Costello's Investments with Mr. Breeman**

22.    Given their close relationship and Mr. Costello's success in his own business ventures, Mr. Breeman approached Mr. Costello about investing with him and CPG.  Specifically, in June 2009, Mr. Breeman first invited Mr. Costello to invest.

September 8, 2009 Promissory Note

23.    Mr. Breeman's June 2009 invitation to Mr. Costello related to a promissory note that Mr. Costello and Mr. Breeman finalized and entered into on September 8, 2009 (the "September 8, 2009 Promissory Note").

24.    Pursuant to the September 8, 2009 Promissory Note, Mr. Costello loaned Mr. Breeman $191,667.00 related to Mr. Breeman's investments in Puerto Rican real estate.

25.    In return, Mr. Costello was to be paid 12% interest per year on any outstanding amounts due as well as a certain percentage of Mr. Breeman's interests in certain Puerto Rican real estate investments.

26.    The September 8, 2009 Promissory Note incorporated by reference a separate December 12, 2008 Loan, Security and Pledge Agreement, executed by both Mr. Breeman as a borrower and Mrs. Breeman as Guarantor.

Investment in WM Realty Services, LLC

27.    Mr. Costello made a second investment with Mr. Breeman in September 2009. Specifically, Mr. Costello paid Mr. Breeman $400,000.00 to become a fifty percent (50%) owner of WM Realty Services, LLC (the "WM Realty Services Agreement").

28.    Pursuant to this agreement, WM Realty Services, LLC was to become an eleven percent (11%) shareholder of CPG and also earn interest on future real estate deals within CPG.

29.     To induce Mr. Costello into making this investment, Mr. Breeman provided Mr. Costello with purported documents detailing CPG's financial status and corporate structure, including, among others, financial statements, tax returns, and corporate structure charts.

30.     Upon information and belief, Mr. Breeman did not have appropriate authority from CPG to enter into the WM Realty Services Agreement, and the WM Realty Services Agreement was a fraudulent investment.

31.     Mr. Costello's investment in WM Realty Services, LLC did not result in any financial return for Mr. Costello, and he lost his initial $400,000.00 investment.

2010 Debt Investment

32.     In October 2010, Mr. Breeman convinced Mr. Costello to invest with him again.

33.     On October 13, 2010, Mr. Breeman wrote to Mr. Costello to request another $100,000.00.

34.     The purported purpose of this investment was to allow WM Realty, LLC to participate in "a venture with Goldman Sachs and other CPG partners … to acquire performing and non performing mortgage loans" from a number of banks in Puerto Rico, including First Bank, Banco Popular, Scotia Bank, and Oriental Bank.

35.     On October 20, 2010, Mr. Breeman explained to Mr. Costello that the investment was projected to yield $4,745,390.00 in profit, which would be divided equally among Mr. Costello, Mr. Breeman, and a third investor.  In other words, over time, Mr. Costello would receive over $1.5 million from his initial investment.

36.     To induce Mr. Costello into making this investment, Mr. Breeman provided Mr. Costello with purported detailed financial documents relating to the investment.

37.     Upon information and belief, this purported investment was fraudulent.

38.    Mr. Costello never received his initial $100,000.00 investment back nor did he receive any of the over $1.5 million he was due to receive from his investment.

Condado Duo Hotels Investment

39.    On October 18, 2013, Mr. Breeman asked Mr. Costello to invest in the Condado Duo hotels in San Juan, Puerto Rico.

40.    According to Mr. Breeman, the Condado Duo Hotels consisted of: (1) the Condado Vanderbilt Hotel, which would be the "best hotel in San Juan"; and (2) the La Concha Hotel.

41.    Mr. Breeman provided Mr. Costello with an Investment Memorandum explaining the purported transaction in detail.

42.    The Investment Memorandum explained that CPG was presented with the opportunity to acquire these hotels.  It further explained in detail the physical specifics of these properties and accompanying financial projections, backed by projected cash flows and returns, income statements, and budget analyses.

43.    For this investment, Mr. Costello and Mr. Breeman entered into a Nominee Agreement dated October 23, 2013 (the "2013 Nominee Agreement").

44.    Pursuant to the 2013 Nominee Agreement, Mr. Costello paid Mr. Breeman $143,000.00 in return for an interest in PR Debt Recap Partners, LLC—the entity investing in the Vanderbilt and La Concha Hotels.

45.    Upon information and belief, this purported investment was fraudulent.

46.    Mr. Costello never received his initial $143,000.00 investment back nor did he receive any of the expected profits that he was due to receive from his investment.

Ultra Park Office Group Investment

47.     In November 2014, Mr. Breeman approached Mr. Costello about an investment opportunity in a commercial real estate building in Costa Rica.

48.     For this investment, Mr. Costello and Mr. Breeman entered into a Nominee Agreement dated November 30, 2014 (the "2014 Nominee Agreement").

49.     Pursuant to the 2014 Nominee Agreement, Mr. Costello paid Mr. Breeman $200,000.00 in return for an economic interest in Ultra Park Office Group—the entity investing in the commercial real estate building in Costa Rica.

50.     On August 3, 2015, Mr. Breeman wrote to Mr. Costello (and other investors) to provide an update on his investment.  Mr Breeman claimed that the project was "going very well." He provided details on multiple specific "new or expanding" corporate tenants investing in the property and/or renegotiating their leases for the property.

51.     On January 23, 2016, Mr. Breeman again wrote to Mr. Costello (and other investors) to provide an update on his investment.  Mr. Breeman claimed that they had completed negotiations, or were in the process of renegotiating, leases for corporate tenants related to the Ultra Park transaction.  He further claimed that the "transaction is running very well" and that he was "pleased with the new acquisitions and the new leases as it all adds enormous value."

52.     In February 2016, Mr. Costello contributed an additional $25,000.00 to this investment.

53.     Upon information and belief, this purported investment was fraudulent.

54.     Other than receiving limited funds in distributions, Mr. Costello did not receive his $225,000 investment back or any of the expected profits he was due to receive from his investment.

DDR PR Retail Investment

55.    In October 2016, Mr. Breeman told Mr. Costello that he needed additional funds in connection with CPG's imminent contemplated acquisition of another real estate deal in Puerto Rico.

56.    To accomplish this, Mr. Costello and Mr. Breeman entered into a Term Promissory Note on October 10, 2016 (the "October 2016 Promissory Note").

57.    Pursuant to the October 2016 Promissory Note, Mr. Costello wired Mr. Breeman $209,733.00.

58.    In return, Mr. Breeman was obligated to pay Mr. Costello back his $209,733.00 (plus interest until repaid), and also pay Mr. Costello an additional $100,000.00 at the closing of CPG's acquisition of the DDR Corp. Puerto Rico Retail Portfolio for approximately $1,500,000,000.00.

59.    Eight months later in May 2017, CPG's contemplated acquisition of the DDR Corp. Puerto Rico Retail Portfolio still had not been completed and Mr. Breeman had not paid Mr. Costello any of the funds due under the October 2016 Promissory Note.  Undaunted, Mr. Breeman asked Mr. Costello for even more money in connection with the transaction.

60.    Mr. Breeman continued to string along Mr. Costello and, as with the prior investment opportunities he presented to Mr. Costello, supported his requests for more money with detailed documents purporting to support his need for the funds.

61.    Mr. Costello believed Mr. Breeman and gave him an additional $300,000.00.

62.    Mr. Costello and Mr. Breeman memorialized this transaction in a May 31, 2017 letter agreement (the "May 2017 Letter Agreement").

63.     Under the May 2017 Letter Agreement, Mr. Breeman was obligated to compensate Mr. Costello for his additional $300,000.00 investment.  Mr. Breeman failed to do so.

64.     Almost three years later, in February 2020, Mr. Breeman came back to Mr. Costello asking a third time for funds related to the contemplated acquisition of the DDR Corp. Puerto Rico Retail Portfolio.

65.     Now, however, in February 2020, Mr. Breeman had apparently changed companies.  He now worked for LatAm Property Group LLC.

66.     Mr. Breeman claimed that he just needed an additional $100,000.00.  He likewise claimed that if Mr. Costello could provide the additional $100,000.00 and the deal closed, Mr. Costello would receive $4,950,000.00.

67.     Upon information and belief, this purported investment was fraudulent.

68.     Mr. Costello never received his $609,733.00 in investment funds back nor did he receive any of the expected profits he was due to receive from his investment.

2024 Loans to Mr. Breeman

69.     Mr. Breeman came back to Mr. Costello for more money three final times in 2024.

70.     Mr. Breeman claimed that he had not been paid in a few months.  He, therefore, asked Mr. Costello in March 2024 to loan him $100,000.00 on the condition that he would pay back the $100,000.00 in a couple of weeks (the "March 2024 Loan").

71.     Mr. Costello loaned Mr. Breeman the $100,000.00 that he requested, but Mr. Breeman never repaid Mr. Costello  for the March 2024 Loan.

72.     In June 2024, Mr. Breeman again pleaded for Mr. Costello to give him another $25,000.00 (the "June 2024 Loan").

73.     Mr. Costello again loaned Mr. Breeman the $25,000.00 that he requested, but Mr. Breeman never repaid Mr. Costello for the June 2024 Loan.

74.     Finally, in August 2024, Mr. Breeman asked for a third loan, this time also for $25,000.00 (the "August 2024 Loan"). Seeking to capitalize on their long-established relationship, Mr. Breeman claimed that he was experiencing personal difficulties and that Mr. and Mrs. Breeman considered the Costello's as their closest friends.

75.     Mr. Costello again loaned Mr. Breeman the $25,000.00 that he requested via wire payment to Mrs. Breeman, but Mr. Breeman never repaid Mr. Costello for the August 2024 Loan.

Mr. Costello's Financial Losses

76.     For each of the investments and/or agreements just described, Mr. Costello entered into the relevant agreement in the United States, Mr. Costello's payments originated in the United States, and Mr. Breeman continued to press Mr. Costello for additional investments from the United States.

77.     As just described, from 2009 through 2020, Mr. Costello invested with Mr. Breeman $1,669,400.00.

78.     In addition, between March and August 2024, Mr. Costello made three loans to Mr. Breeman totaling $150,000.

79.     Even including any limited financial returns that Mr. Costello received, Mr. Costello lost over $1 million from his dealings with Mr. Breeman.

80.     Upon information and belief, Mr. Costello's investments were used to fund Mr. and Mrs. Breeman's lifestyle.

    **C.**     **Mr. Breeman Admits That He Operated a Ponzi Scheme**

81.     Upon information and belief, in September 2024, Mr. Breeman attempted to take his own life.

82.     On September 19, 2024, Mrs. Breeman informed Mr. Costello that Mr. Breeman attempted suicide because he had been running a "Ponzi scheme" that was going to be discovered. In response, Mr. Costello told Mrs. Breeman that he was likely a victim of Mr. Breeman's Ponzi scheme.

83.     Also on September 19, 2024, Mrs. Breeman gave Mr. Costello a suicide note that Mr. Breeman wrote to Mrs. Breeman.

84.     In Mr. Breeman's suicide note, he admitted that he "did some terrible things that will shortly unravel" and that he "stole a lot of money from many investors for non-existent real estate deals."

85.     Mr. Breeman explicitly admitted that he had been running a "Ponzi scheme." Indeed, he wrote to Mrs. Breeman that he "knew this was going to unravel, as every Ponzi scheme does, when the payments cannot be kept up."

86.     As to the specifics of the Ponzi scheme, Mr. Breeman advised Mrs. Breeman that he kept an "Investor Schedule" on his laptop that included information on "everyone who 'invested,' how much, distributions, etc."

87.     Mr. Breeman likewise admitted that he "[took] funds from" friends, including from Mr. Costello, before Mr. and Mrs. Breeman became "very friendly with the Costello's."

88.     Mr. Breeman informed Mrs. Breeman that he thought it would be "much better for you, that I commit suicide, rather than becoming a living target for the people I defrauded."

89.    To that end, Mr. Breeman instructed Mrs. Breeman to contact others that could assist her to "immediately file a personal bankruptcy which will freeze everything that could happen including lawsuits, foreclosures, etc." and "fend off angry creditors."

90.    Mr. Breeman also instructed Mrs. Breeman that she should fraudulently conceal her valuables to prevent his creditors from being able to collect on them, including instructing her to "take valuables (Cartier watch, diamond bracelet, any paintings that may be valuable, any of the Fornasetti with the chair and screen as most valuable) and hide them."  He even told Mrs. Breeman that others could "hold them to sell for cash."

91.    In the suicide note, Mr. Breeman also informed his wife that he "signed [her] name" on an unsecured loan on their house and claimed that she was "not responsible" for this fraudulent signature.

92.    Upon information and belief, Mr. Breeman's suicide note was an attempt to shield Mrs. Breeman and Mr. Breeman's business partner from being blamed for the Ponzi scheme.

93.    On September 20, 2024, Mrs. Breeman told Mr. Costello that Mr. Breeman's fraud likely surpassed $50 million and that a list of his victims could be found on his laptop.

94.    Despite Mr. Breeman's suicide note specifically identifying Mr. Costello as a victim of his Ponzi scheme, on September 21, 2024, Mrs. Breeman told Mr. Costello that he was not included in the list of victims on Mr. Breeman's laptop.  Mr. Costello told Mrs. Breeman that Mr. Breeman must not have finished the list.

95.    Upon information and belief, other prominent individuals were included on Mr. Breeman's list of victims of his Ponzi scheme, including others that had invested millions of dollars with Mr. Breeman.

96.     Upon information and belief, Mr. Breeman received medical care for, but did not pass away from, his attempted suicide.

97.     Upon information and belief, in the months since his attempted suicide, Mr. Breeman has continued to work on real estate investment deals.

### COUNT I
### VIOLATION OF THE EXCHANGE ACT OF 1934, 15 U.S.C. § 78j(b), AND RULE 10B-5 THEREUNDER, 17 C.F.R. § 240.10b-5
### (Against Mr. Breeman)

98.     Mr. Costello restates and realleges all previous paragraphs.

99.     Mr. Breeman, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

100.    By reason of the foregoing, Mr. Breeman, directly or indirectly, has violated the Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

101.    Mr. Costello detrimentally relied on, and has been damaged as a direct and proximate result of, Mr. Breeman's violations.

### COUNT II
### BREACH OF CONTRACT
### (Against Mr. Breeman)

102.    Mr. Costello restates and realleges all previous paragraphs.

103.    Multiple valid agreements existed between Mr. Costello and Mr. Breeman, including the WM Realty Services Agreement, the 2013 Nominee Agreement, the 2014 Nominee Agreement, the October 2016 Promissory Note, the May 2017 Letter Agreement, and the March 2024 Loan, June 2024 Loan, and August 2024 Loan.

104.    Mr. Costello performed all of his obligations under the valid agreements that existed between Mr. Costello and Mr. Breeman, including the WM Realty Services Agreement, the 2013 Nominee Agreement, the 2014 Nominee Agreement, the October 2016 Promissory Note, the May 2017 Letter Agreement, and the March 2024 Loan, June 2024 Loan, and August 2024 Loan.

105.    Mr. Breeman breached the valid agreements that existed between Mr. Costello and Mr. Breeman, including the WM Realty Services Agreement, the 2013 Nominee Agreement, the 2014 Nominee Agreement, the October 2016 Promissory Note, the May 2017 Letter Agreement, and the March 2024 Loan, June 2024 Loan, and August 2024 Loan.

106.    Mr. Costello has been damaged as a direct and proximate result of Mr. Breeman's contractual breaches.

## COUNT III
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Mr. Breeman)

107.    Mr. Costello restates and realleges all previous paragraphs.

108.    Mr. Breeman owed Mr. Costello a duty to act in good faith and conduct fair dealing in connection with the investment transactions described herein.

109.    Mr. Breeman breached his duty to act in good faith and conduct fair dealing by engaging in the actions described herein, even if such actions were not explicitly stated in the agreements between Mr. Costello and Mr. Breeman.

110.    Mr. Costello has been damaged as a direct and proximate result of Mr. Breeman's breaches of his duty to act in good faith and conduct fair dealing in connection with the investment transactions described herein.

**COUNT IV**
**FRAUD**
**(Against Mr. Breeman)**

111.    Mr. Costello restates and realleges all previous paragraphs.

112.    In furtherance of his admitted Ponzi scheme, Mr. Breeman made material misrepresentations to Mr. Costello in connection with the investment transactions described herein.

113.    The material misrepresentations that Mr. Breeman made to Mr. Costello in furtherance of his Ponzi scheme and in connection with the investment transactions described herein were false.

114.    Mr. Breeman knew, and has since admitted, that the material misrepresentations he made to Mr. Costello in furtherance of his Ponzi scheme and in connection with the investment transactions described herein were false.

115.    Upon information and belief, Mr. Breeman knowingly made these false material misrepresentations with the intention of inducing Mr. Costello to rely on them for Mr. Costello to provide him the funds described herein and become a victim of the Ponzi scheme.

116.    The misrepresentations discussed herein were about facts that a reasonable person would likely consider important in choosing to participate in the investment transactions described herein and that have a natural tendency to lead a reasonable person to change his conduct.

117.    Mr. Costello justifiably relied on Mr. Breeman's false material misrepresentations.

118.    Mr. Breeman's fraudulent behavior has caused Mr. Costello damages in an amount to be determined a trial with such amount being at least $1 million.

119.    Based on Mr. Breeman's egregious actions, Mr. Costello is entitled to punitive damages in an amount to be determined by the Court.

**COUNT V**
**VIOLATION OF NEW YORK DEBTOR & CREDITOR LAW § 273**
**(Against Defendants)**

120.    Mr. Costello restates and realleges all previous paragraphs.

121.    Upon information and belief, Defendants fraudulently transferred their assets as discussed herein with the actual intent to hinder, delay, or defraud Mr. Costello within the meaning of New York Debtor & Creditor Law § 273.

122.    Upon information and belief, Defendants engaged in these fraudulent transfers because they believed that Mr. Breeman's substantial debts arising from his Ponzi scheme would soon be discovered.

123.    Mr. Costello is entitled to an order setting aside or voiding the fraudulent transfers discussed herein to recover the amounts necessary to satisfy his claims.

**COUNT VI**
**CONVERSION**
**(Against Mr. Breeman)**

124.    Mr. Costello restates and realleges all previous paragraphs.

125.    Mr. Costello had ownership, possession, or control of the funds described herein prior to Mr. Breeman converting those funds in furtherance of his Ponzi scheme.

126.    Also in furtherance of his Ponzi scheme, Mr. Breeman intentionally and without authority converted Mr. Costello's funds described herein and interfered with Mr. Costello's right of possession to same.

127.    Mr. Costello has been damaged as a direct and proximate result of Mr. Breeman's conversion.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Against Defendants)**

128.    Mr. Costello restates and realleges all previous paragraphs.

129.    Mr. Costello may recover under unjust enrichment if the Court determines that the agreements discussed herein do not govern some or all of the dispute or that the agreements discussed herein are invalid or unenforceable.

130.    Mr. Costello provided a benefit to Defendants by providing them the funds described herein at Mr. Breeman's request.

131.    Mr. Costello's relationship with Defendants was sufficiently close to cause him to provide the funds described herein at Mr. Breeman's request.

132.    Defendants accepted, used, and/or enjoyed the use of Mr. Costello's funds at Mr. Costello's expense.

133.    It is against equity and good conscience to permit Defendants to retain the benefit of Plaintiff's funds as described herein.

134.    Plaintiff has been damaged as a direct and proximate result of Defendants' unjust enrichment.

**PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Costello demands judgment against Defendants as follows:

A.    Enter judgment for Mr. Costello on every Count of the Complaint;

B.    Award Mr. Costello actual monetary damages, both past and future, in an amount to be determined at trial, to compensate Mr. Costello for the injury he has sustained because of Defendants' tortious and unlawful conduct, as well as punitive damages;

C.    Enter an order setting aside or avoiding the fraudulent transfers discussed herein to recover the amounts necessary to satisfy Mr. Costello's claims;

D.    Award Mr. Costello pre-judgment and post-judgment interest, reasonable attorneys' fees and costs; and

E.    Award Mr. Costello such other and further relief as the Court deems proper.

## DEMAND FOR A JURY TRIAL

Mr. Costello demands a jury trial as to all issues arising in this action that are so triable.

Dated: March 21, 2025                    Respectfully submitted,

**FAEGRE DRINKER BIDDLE & REATH LLP**
By: */s/ Frank F. Velocci*
Frank F. Velocci
Kevin H. DeMaio
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Tel.: (212) 248-3140
Email: frank.velocci@faegredrinker.com
         kevin.demaio@faegredrinker.com

*Attorneys for Plaintiff Brian Costello*